**Jennifer M. RICHARDSON and Plymouth Community Schools, Appellants–Defendants,**

v.

**Elisa CALDERON, Appellee–Plaintiff.**

**No. 50A03–9811–CV–469.**

Court of Appeals of Indiana.

June 30, 1999.

Rehearing Denied Aug. 17, 1999.

Steven D. Groth, Peter J. Agostino, Philip E. Kalamaros, Peter J. Bagiackas, Edward N. Kalamaros & Associates, Professional Corporation, South Bend, Indiana, Attorneys for Appellants.

Paul B. Kusbach, Paul Kusbach Attorneys, South Bend, Indiana, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge

Jennifer M. Richardson and Plymouth Community Schools bring an interlocutory appeal claiming that the trial court erred in denying their motions for summary judgment in this negligence case filed by Elisa Calderon which arose as a result of an automobile accident that occurred on May 30, 1996. The following restated issues are presented in this appeal:

1. Did the trial court err in denying Richardson's motion to strike portions of the affidavit of William H. Youngs, Ph. D.?

2. Did the trial court err in denying Richardson's motion to strike certain newspaper articles relating to the accident involving Calderon, her injuries, and her recovery?

3. Did the trial court err in denying the motions for summary judgment on the basis that there are genuine issues of material fact that preclude the granting of such motions?

4. Should summary judgment have been entered in favor of Richardson upon her claim that Calderon failed to return the consideration she received from Richardson's insurer in exchange for the release?

We affirm.

On May 30, 1996, Calderon was a passenger in the bed of a pickup truck being driven by Richardson. Richardson and Calderon, who had just graduated from Plymouth High School, were taking part in a senior class parade through downtown Plymouth when Richardson made a sharp turn at an intersection, causing Calderon to fall from the truck and hit her head on the pavement. Calderon sustained serious head and brain injuries. During the course of a two-week stay at Memorial Hospital in South Bend, Calderon was diagnosed with a closed head injury and a traumatic brain injury and was prescribed an anti-seizure medication, which she continued to take throughout 1996. According to Calderon, she experienced a number of side effects while taking the anti-seizure medication, including "drowsiness, increased difficulty in concentration, shortened attention span, and [a] general feeling of being medicated." *Record* at 164.

Upon her discharge from Memorial Hospital on June 14, 1996, Calderon was admitted to Memorial Hospital's traumatic brain injury outpatient rehabilitation program. While in the outpatient rehabilitation program, Calderon came under the care of William H. Youngs, Ph.D., a licensed psychologist and clinical neuropsychologist who practices at Memorial Hospital's Independent Living Center. Dr. Youngs treated Calderon throughout the month of June 1996, and his last clinical contact with her was in July 1996. Against medical advice, Calderon discharged herself from the outpatient rehabilitation program in mid-August 1996.

In an affidavit designated by Calderon in support of her claim that summary judgment would be inappropriate because material issues of fact exist, Dr. Youngs stated that "[t]here were clear indications from Elisa Calderon's behavior during the clinical contacts, as well as the neuropsychological evaluation that there were difficulties in frontal lobe system executive functioning regarding planning, organization, self-monitoring, and judgment." *Record* at 170.

Calderon attended Bethel College in the fall of 1996. Although Calderon stated in her affidavit that she struggled while at Bethel College, she took six classes and earned a cumulative grade point average of 3.199 during the fall semester. In one class, English 101: Written Communication II, Calderon received the grade of B+.

Cincinnati Insurance insured the vehicle that Richardson was driving at the time of the May 30, 1996 accident. On December 16, 1996, Jeffrey Guy, a claims adjuster for Cincinnati Insurance, contacted Calderon by telephone to discuss a possible settlement of her claim against Richardson. During the telephone conversation, Guy and Calderon discussed Calderon's concerns over her unpaid medical bills. Calderon told Guy that she wanted the bills to be paid. A meeting was set for December 18, 1996, and Guy asked Calderon to bring her medical bills to the meeting so that he could verify the extent of her injuries.

The meeting took place on December 18 at an insurance company office. Calderon, a Hispanic woman for whom English was her second language, was accompanied at the meeting by her mother, who did not speak English. After reviewing Calderon's medical bills, Guy filled in details on a form entitled, "RELEASE OF ALL CLAIMS". *Record* at 286. Guy presented the release to Calderon and offered, if she signed the release, to issue her a check for $32,263.69, which was approximately $1,000.00 more than the total of Calderon's medical bills. The release stated:

KNOW ALL MEN BY THESE PRESENTS:

That the Undersigned, being of lawful age, for the sole consideration of Thirty Two Thousand Two Hundred Sixty Three and 69/100 Dollars ($32,263.69) to the undersigned in hand paid, receipt whereof is hereby acknowledged, do/does hereby and for my/our/its heirs, executors, administrators, successors and assigns release, acquit and forever discharge John Glaub and Mary Pat Glaub and Jenny Richardson and The Cincinnati Insurance Co. and his, her, their, or its agents, servants, successors, heirs, executors, administrators and all other persons, firms, corporations, associations or partnerships of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation what-

soever, which the undersigned now has/ have or which may hereafter accrue on account of or in any way growing out of any and all known and unknown, foreseen and unforeseen bodily and personal injuries and property damage and the consequences thereof resulting or to result from the accident, casualty or event which occurred on or about the 30th day of May, 1996, at or near Berkley & Columbus Streets in Plymouth, Indiana in Marshall County Indiana.

It is understood and agreed that this settlement is the compromise of a doubtful and disputed claim, and that the payment made is not to be construed as an admission of liability on the part of the party or parties hereby released, and that said releasees deny liability therefor and intend merely to avoid litigation and buy peace.

The undersigned hereby declare(s) and represent(s) that the injuries sustained are or may be permanent and progressive and that recovery therefrom is uncertain and indefinite and in making this Release it is understood and agreed, that the undersigned rely(ies) wholly upon the undersigned's judgment, belief and knowledge of the nature, extent, effect and duration of said injuries and liability therefor and is made without reliance upon any statement or representation of the party or parties hereby released or their representatives or by any physician or surgeon by them employed.

The undersigned further declare(s) and represent(s) that there may be unknown or unanticipated injuries resulting from the above stated accident, casualty or event and in making this Release it is understood and agreed that this Release is intended to include such injuries.

The undersigned further declare(s) and represent(s) that no promise, inducement or agreement not herein expressed has been made to the undersigned, and that this Release contains the entire agreement between the parties hereto, and that the terms of this Release are contractual and not a mere recital.

This Release expressly reserves all rights of the person, or persons, on whose behalf the payment is made and the rights of all persons in privity or connected with them, and reserves to them their right to pursue their legal remedies, if any, including but not limited to claims for contribution, property damage and personal injury against the undersigned or those in privity or connected with the undersigned.

THE UNDERSIGNED HAS READ THE FOREGOING RELEASE AND FULLY UNDERSTANDS IT.

*Record* at 286. The release was signed by Calderon, but not dated. It was also notarized by Shawna Thomas. However, the notation by Thomas on the bottom of the release states that Calderon appeared before her and executed the release on January 18, 1996, not December 18, 1996.

Calderon filed her complaint against Richardson, the City of Plymouth,[1] and Plymouth Community Schools on June 10, 1997. In her answer, Richardson asserted, among other things, the release as an affirmative defense. Likewise, Plymouth Community Schools asserted as an affirmative defense that Calderon had received compensation from collateral sources and was not entitled to recover a second time.

Richardson and Plymouth Community Schools thereafter filed motions for summary judgment pursuant to Ind. Trial Rule 56. In support of her motion for summary judgment, Richardson designated her memorandum in support of summary judgment as well as the complaint, Richardson's answer to the complaint, and the affidavits of Guy and Thomas. Richardson later supplemented her T.R. 56(C) designation to include an affidavit of Sharon M. Snyder, the Registrar for Bethel College, and a copy of Calderon's official transcript from Bethel College. In support of its motion for summary judgment, Plymouth Community Schools designated the release signed by Calderon on December 18, 1996. In response to the motions for summary judgment, Calderon argued that

There is a genuine issue of material fact as to whether Elisa Calderon was compe-

---

1. The City of Plymouth is not a party to this appeal.

tent on December 18, 1996, to sign the "release" submitted as Defendant's Exhibit A and Plaintiff's Exhibit "C", and thus whether she made a knowing and willful release of her claim against the defendant, as well as whether the release was made under duress and undue influence. *Record* at 148. In support of her argument that genuine issues of material fact exist, Calderon designated to the court her memorandum in opposition to summary judgment as well as her own affidavit, the affidavit of Dr. Youngs and the neuropsychological screening and evaluation report attached to that affidavit, and two newspaper articles, one from the May 31, 1996 edition of *The Pilot–News* entitled "Woman injured in senior cruise 'fair' ", and one published during the summer of 1996 in *The Tribune* entitled "Injured senior wants end to cruise".

Richardson filed a motion to strike portions of Dr. Youngs's affidavit and the newspaper articles.

On September 4, 1998, the trial court entered an order denying the motions for summary judgment and Richardson's motion to strike portions of Dr. Youngs's affidavit and the newspaper articles. The court specifically found that there are genuine issues of material fact that preclude the granting of Richardson's and Plymouth Community Schools's motions for summary judgment. In addition, the trial court noted in its order that, during the hearing held on the motions for summary judgment and to strike, counsel for Richardson orally requested that, if Richardson's motion for summary judgment was not granted, Calderon be ordered to return the monies she received. The trial court ordered that "the oral request for repayment of monies shall remain under advisement pending further hearing to be scheduled on request." *Record* at 294.

Richardson and Plymouth Community Schools thereafter filed petitions with the trial court to certify that the conditions for an interlocutory appeal to this court had been met. The trial court entered an order certifying the interlocutory appeal pursuant to Ind. Appellate Rule 4(B)(6), and this appeal ensued.

Additional facts will be set forth where pertinent.

## 1.

■ Richardson claims that the trial court erred in denying her motion to strike portions of Dr. Youngs's affidavit. Specifically, Richardson objects to paragraphs 8 through 10 of Dr. Youngs's affidavit and claims that Dr. Youngs's opinion that Calderon lacked the mental capacity to understand the release is speculative and unsupported because: 1) he had no personal knowledge of Calderon's symptoms in December 1996 when Calderon signed the release; and 2) no foundation had been laid to establish that Dr. Youngs was qualified to render an opinion concerning Calderon's mental capacity five months after the last time he saw her in a clinical setting.

■ This court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *Ford v. State*, 704 N.E.2d 457 (Ind.1998); *Zemco Mfg., Inc. v. Pecoraro*, 703 N.E.2d 1064 (Ind.Ct.App.1998), *trans. denied.* We will reverse such an exercise of discretion only when the decision is clearly against the logic and effect of the facts and the circumstances. *Ford v. State*, 704 N.E.2d 457; *Zemco Mfg., Inc. v. Pecoraro*, 703 N.E.2d 1064.

Affidavits in support of or in opposition to a motion for summary judgment are governed by T.R. 56(E). *Miller v. Monsanto Co.*, 626 N.E.2d 538 (Ind.Ct.App.1993). T.R. 56(E) provides in pertinent part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

Dr. Youngs's affidavit stated in pertinent part:

8. Although Elisa Calderon performed relatively well in the structured neuropsychological testing environment, it is my clinical impression that she would have more difficulty in less structured settings giving [sic] the frontal lobe damage/dysfunction and difficulty with executive system functioning. Individuals with damage

to the frontal lobes of the brain tend to have difficulties with attention, concentration, organizing their thoughts, difficulty with understanding . and comprehending complex ideas, and dividing their attention between competing events. It is also typically the case, and it is the case with Elisa Calderon, that she tended to minimize and deny the extent of her neurological deficits, such that she would not indicate to others that she had problems nor even perceive herself that she had problems. In this regard, it is very unlikely that Elisa Calderon would be able to appreciate and understand a complicated legal document such as that which I have been shown, which I am told she signed on December 18, 1996. . . .

9. My last clinical contact with Elisa Calderon was July of 1996. She had difficulty in attending the program because of fatigue, transportation issues, and possibly questionable comprehension of the extent of her deficits. She ultimately discharged herself from the program against our advice. It is unfortunate that Elisa Calderon discharged herself from the program as the staff of the Independent Living Center most likely would have been able to improve her cognitive functioning, thereby helping her make better judgments in the future. This would have been true both in her academic setting at Bethel College, of which we had concerns about her attending on a full time basis, as well as her ability to comprehend and use good judgment in terms of complex legal situations.

10. It is my opinion that Elisa Calderon did not appreciate and understand the complicated legal document given to her about six months after her traumatic brain injury on May 30, 1996. . . .

*Record* at 170–72.

It is readily apparent that Dr. Youngs's affidavit, when read in its entirety, meets the criteria set forth in T.R. 56(E) and that there was a proper foundation for the opinions contained in the affidavit. Such affidavit was made on the bases of Dr. Youngs's own personal knowledge of Calderon's injuries as well as Calderon's behavior during clinical contacts, a neuropsychological

screening and comprehensive neuropsychological evaluations conducted by Dr. Youngs, and neuropsychological counseling/psychotherapy provided by Dr. Youngs. In addition, it is apparent from the affidavit that Dr. Youngs, a licensed psychologist and clinical neuropsychologist, was personally familiar not only with Calderon's cognitive functioning, but also with the limitations generally found in individuals, such as Calderon, with damage to the frontal lobes of the brain.

The trial court did not abuse its discretion in refusing to strike paragraphs 8 through 10 of Dr. Youngs's affidavit.

2.

We next address whether the trial court erred in denying Richardson's motion to strike the newspaper articles relating to Calderon's accident, her injuries, and her recovery. Richardson claims that the newspaper articles contain unsworn statements and are unverified exhibits which constitute inadmissible hearsay.

Again, we apply an abuse of discretion standard when reviewing a trial court's evidentiary rulings. *Ford v. State,* 704 N.E.2d 457; *Zemco Mfg., Inc. v. Pecoraro,* 703 N.E.2d 1064.

■ Calderon asserts before this court, as she did before the trial court, that the newspaper articles were not offered to prove the truth of the matter asserted and, therefore, they did not constitute inadmissible hearsay. Calderon asserts that the newspaper articles were included in Guy's files and "were part of Cincinnati Insurance Company's response to a proper Ind. Trial Rule 34(C) Request for Production." Appellee's Brief at 4. Accordingly, she asserts that the articles were offered to establish Guy's state of mind, *i.e.,* that Guy was aware of the severity of Calderon's brain injuries and the degree to which those injuries interfered with Calderon's cognitive functioning "when he talked her into signing the release in his office under the pretense that she was getting insurance money to pay her medical bills." Appellee's Brief at 28.

■ A trial court errs in excluding on hearsay grounds newspaper articles where the articles are not offered into evidence to establish the truth of the matter asserted, but rather are properly offered to establish other facts or inferences. *Kucki v. State,* 483 N.E.2d 788 (Ind.Ct.App.1985). In this case, Calderon did not offer the newspaper articles to establish the truth of the matter asserted therein. Accordingly, the trial court did not abuse its discretion in denying Richardson's motion to strike those articles.

### 3.

■ We next address whether the trial court erred in denying the motions for summary judgment on the basis that there are genuine issues of material fact that preclude the granting of such motions.

In an Indiana summary judgment proceeding, "the party seeking summary judgment must demonstrate the absence of any genuine issue of fact as to a determinative issue, and only then is the non-movant required to come forward with contrary evidence." *Jarboe v. Landmark Community Newspapers of Indiana, Inc.,* 644 N.E.2d 118, 123 (Ind. 1994). T.R. 56(C) provides in pertinent part:

At the time of filing [a] motion [for summary judgment] or response, a party shall designate to the court all parts of pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice, and any other matters on which it relies for purposes of the motion. A party opposing the motion shall also designate to the court each material issue of fact which that party asserts precludes entry of summary judgment and the evidence relevant thereto. The judgment sought shall be rendered forthwith if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

On the other hand, summary judgment should not be entered where material facts conflict or where conflicting inferences are possible. *Miller v. Monsanto Co.,* 626 N.E.2d 538.

When reviewing the grant or denial of a motion for summary judgment our standard of review is the same as that used by the trial court: whether there is a genuine issue of material fact and whether the moving part is entitled to judgment as a matter of law. On review, we may not search the entire record to support the judgment, but may only consider that evidence which has been specifically designated to the trial court. The party appealing the trial court's grant or denial of summary judgment has the burden of persuading this court that the trial court's decision was erroneous. A summary judgment determination shall be made from any theory or basis found in the evidentiary matter designated to the trial court.

*City of New Haven v. Chemical Waste Management of Indiana, L.L.C.,* 701 N.E.2d 912, 922 (Ind.Ct.App.1998), *trans. denied* (citations omitted).

Richardson argues that the trial court erred in denying her summary judgment motion because the release executed by Calderon on December 18, 1996 was an unambiguous, general release, that Calderon understood and voluntarily signed the release, and that Calderon therefore knowingly and willingly released Richardson from any and all personal injury claims she had against her as a result of the May 30, 1996 accident. Richardson also claims that Calderon had the mental capacity to understand the release because, at the time Calderon signed it, she maintained over a B average as a freshman at Bethel College.

Plymouth Community Schools argues that: 1) it was Calderon's burden to prove that she should be able to avoid the release because of incapacity; 2) the evidence Calderon presented failed to create a genuine issue of fact regarding her incapacity; and 3) as a third-party beneficiary of the release signed by Calderon, it is entitled to judgment as a matter of law.

Calderon argues that the trial court's order denying summary judgment should be affirmed because she lacked the capacity to make a knowing and voluntary release of her rights and that, under the circumstances, the execution of the release was unconscionable.

The evidentiary materials designated to the trial court establish that there are genuine issues of material fact with regard to whether Calderon was competent to sign the release submitted to her on December 18, 1996, whether she made a knowing and willful release of her claims, and whether the release was made under duress or undue influence or was otherwise unconscionable. Accordingly, the trial court did not err in denying Richardson's and Plymouth Community Schools's motions for summary judgment.

### 4.

■ We decline to address Richardson's claim that summary judgment should have been entered in her favor upon her claim that Calderon failed to return, prior to instituting this action, the consideration she received from Richardson's insurer in exchange for the release. As noted above, Richardson's attorney orally raised this issue, apparently for the first time, at the hearing on the motions for summary judgment,[2] and the trial court ordered that Richardson's request for repayment of the money received by Calderon remain under advisement pending a further hearing to be scheduled upon request. Generally, we will consider only those issues which were briefed and argued by the parties before the trial court and which the trial court considered and ruled upon. *See WorldCom Network Servs., Inc. v. Thompson,* 698 N.E.2d 1233 (Ind.Ct.App.1998), *trans. denied.* We do not issue advisory opinions. *Hill v. State,* 592 N.E.2d 1229 (Ind.1992).

Judgment affirmed.

KIRSCH, J., and MATTINGLY, J. concur

---

**2.** The appellants have not provided this court with a transcript of the summary judgment hearing.